**Robert W. SHANK, Plaintiff–Appellee,**

v.

**KELLY–SPRINGFIELD TIRE COMPANY, Defendant– Appellant.**

**No. 96–4011.**

United States Court of Appeals, Seventh Circuit

Oct. 1, 1997.

Mary E. Kennelly (argued), Fox & Fox, Madison, WI, for Plaintiff–Appellee.

Michael H. Auen (argued), Anita M. Sorensen, Foley & Lardner, Madison, WI, foe Defendant–Appellant.

Before POSNER, Chief Judge, and BAUER and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Robert Shank was terminated by Kelly–Springfield Tire Company in November 1994. Kelly–Springfield said it fired him because Mr. Shank filed a fraudulent claim for a refund in contravention of company policy. Mr. Shank said the real reason was his age and brought this suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* After the jury returned a verdict in Mr. Shank's favor, Kelly–Springfield moved for a judgment as a matter of law or, in the alternative, for a new trial. The motion was denied. Kelly–Springfield now appeals. For reasons that follow, we reverse the judgment of the district court.

## I

## BACKGROUND

Kelly–Springfield, which is owned by The Goodyear Tire & Rubber Company, sells and manufactures tires. It hired Mr. Shank in 1984 as a district manager, a position which Mr. Shank occupied until his termination in 1994. As a district manager, Mr. Shank was responsible for cultivating sales relationships with tire dealers in his district. His basic job responsibility was to get more tire dealers to sell more Kelly–Springfield tires. Mr. Shank was terminated on November 3, 1994, when he was 53 years old. The company claims it fired Mr. Shank because he submitted a fraudulent claim for a refund. Other than the admitted fraud, Mr. Shank's job performance generally had been acceptable. After he was terminated, Mr. Shank was replaced by James Lautzenheiser (or Lautzenhauser). Lautzenheiser, who took over Mr. Shank's job in January 1995, was about 20 years younger than Mr. Shank.

Mr. Shank admits that he attempted to defraud the company in July 1994. One of the dealers in Mr. Shank's district was Westside Wholesale Tire & Supply Inc., located in Hamel, Minnesota. Westside Wholesale had been reluctant to stock Kelly–Springfield's hydroguard tire because that particular brand of tire is a rain tire that did not sell well in the northern midwest, where most customers are concerned about traction on snow and ice. In order to persuade Westside Wholesale to stock the hydroguard tire, Mr. Shank decided to sell Shawn Leuer, the dealer, a discounted set of hydroguards so Leuer could try them out. The Goodyear Business Conduct Policies, however, prohibited Mr. Shank from selling tires to dealers at a discounted price.[1] Ex. 207 at 5. Mr. Shank and Leuer, therefore, devised a scheme that, if successful, would allow such a sale to go through unnoticed by Kelly–Springfield. First Leuer paid the money for the tires. Then a Westside Wholesale invoice, dated July 26, 1994, was made out that purported to evidence that four hydroguard tires had been sold to Mr. Shank by Westside Wholesale. Mr. Shank attached the invoice to a "Tire Purchase Refund Request" and sent it along to his supervisor, Ronald

---

1. Mr. Shank received written reprimands dated June 28, 1994, and August 15, 1994, for paying cash to dealers for sales promotions without special approval. The August 15 letter stated:

The $100 invoice should not have been included in your expense report. It is not a policy of The Kelly–Springfield Tire Company to pay cash money out of one's pocket to salesmen or anyone else for services rendered or products sold....

Under no circumstances do you pay cash out of your pocket. This is strictly forbidden and is in direct violation of the Business Conduct Policies of the Corporation. Failure to adhere to these policies can result in immediate dismissal from the Company.
Ex. 202.

Thrasher.[2] Mr. Shank explained at trial that he had planned to get a rebate from the company and then pass it along to Leuer. Leuer would get a bargain on the tires, and Mr. Shank would get, he hoped, a new customer.

The plan, however, was foiled when Thrasher received the refund request in August. He suspected fraud because Westside Wholesale was seven hours from Mr. Shank's home; Thrasher thought it strange that Mr. Shank would travel such a long distance for tires for personal use. Thrasher relayed his suspicions to his supervisor, Vice President Frank James, who told him to call the dealer. Thrasher did so and verified that Mr. Shank had not been the one who purchased the tires. James then told Thrasher to sign the refund form and send it to him. James retained the original form and did not process it for payment or send it to the accounting department. Thrasher also retained a copy on which he noted, "completed after Frank told me to." Ex. 8. James testified that he agreed with Thrasher that, because of the fraud, Mr. Shank should be discharged; accordingly, James authorized Mr. Shank's termination. Mr. Shank, however, was not fired until November 3, 1994. James testified that, in late October or early November, Thrasher called and wanted to move forward with Mr. Shank's termination. Upon being told that Mr. Shank was still working for the company, James was "a little taken back because I assumed that it [Mr. Shank's discharge] had been done." Tr. at 2–148. Thereafter, on November 3, 1994, Thrasher fired Mr. Shank as James had directed. No mention was ever made of Mr. Shank's age by Thrasher, James or anyone else associated with Kelly–Springfield.

In mid-November James made a request to Thomas Nelms, the manager of sales training for Kelly–Springfield, for a replacement for Mr. Shank. James did not request a specific person, but rather the best qualified individual. Nelms assigned Lautzenheiser to replace Mr. Shank. Because Lautzenheiser was not adequately prepared in November, he did not take over Mr. Shank's duties until January 1995. In the meantime, Thrasher was responsible for Mr. Shank's district. Lautzenheiser had been hired as a sales trainee in June 1994.

Mr. Shank sued Kelly–Springfield alleging that he was fired on account of his age. The trial lasted one day. During the plaintiff's case, three witnesses—Mr. Shank, James and Nelms—testified, and three deposition summaries were read to the jury. Mr. Shank admitted filing a rebate form that contained untruthful representations. He confessed that he was seeking a refund for money he had not spent, that he had no authority to give Leuer a refund, and that he had not sought approval for the deal. A summary of Thrasher's deposition was also read to the jury. The summary included a description of Thrasher's treatment of Kevin Harper, a younger district manager. Harper had been criticized for submitting untimely expense reports, charging phone calls to his Goodyear credit card and running past-due on his corporate Visa card. Harper had not been threatened with termination.

Kelly–Springfield called James to testify during its case and, at the first available break, moved for judgment as a matter of law. The district court expressed some real doubts about whether Mr. Shank had presented enough evidence to get to a jury. The court noted that James had testified that he had wanted Thrasher to fire Mr. Shank in August. James had been surprised in October to learn that Thrasher had not. However, because this latter testimony had been drawn out during the presentation of the defendant's case, the court denied the motion. Kelly–Springfield then rested its case and, based on all the evidence (including James' testimony), renewed its motion, but the court reserved ruling and decided to allow the case to go to the jury. During the rebuttal closing argument, Mr. Shank's counsel explained some exhibits to the jury that purportedly showed that, within a year of Mr. Shank's termination, all district managers over the age of 50 were no longer with the company. The only district manager in Mr. Shank's district older than Mr. Shank

---

2. Under Kelly–Springfield's employee tire discount program, Kelly–Springfield employees and family members can purchase up to twelve tires a year at a discount price.

had announced his retirement several months before Mr. Shank's termination. The jury returned a verdict for Mr. Shank and determined that the ADEA violation had been willful. The court later denied Kelly–Springfield's motion for a judgment as a matter of law or, alternatively, a new trial.

## II

## DISCUSSION

On appeal, Kelly–Springfield contends that the district court should have granted its motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. In reviewing the district court's decision, we examine the record as a whole to determine whether there was sufficient evidence from which a reasonable jury could have found age discrimination. *Pierce v. Atchison, Topeka & Santa Fe Ry.,* 65 F.3d 562, 572 (7th Cir.1995); *Futrell v. J.I. Case,* 38 F.3d 342, 346 (7th Cir.1994); *Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1421 (7th Cir.1992); *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1054 (7th Cir.1990). Here, Mr. Shank had no direct evidence of age discrimination. Rather, on the basis of circumstantial evidence, he asked the jury to draw the inference that Kelly–Springfield fired him because of his age. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Futrell,* 38 F.3d at 345–46. In such a case, the " 'factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.' " *Id.* at 346 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)); *see Gehring v. Case Corp.,* 43 F.3d 340, 343 (7th Cir.1994), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). Mr. Shank has a prima facie case. The question for us, therefore, is whether Mr. Shank placed before the jury sufficient evidence from which it could have reasonably concluded that Kelly–Springfield's proffered reason for termination "was a pretext for a willful decision to discharge [Mr. Shank] on account of his age." *Futrell,* 38 F.3d at 346; *see*

*Perfetti v. First Nat'l Bank,* 950 F.2d 449, 452 (7th Cir.1991), *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992). We must assess the evidence in its entirety. After completion of trial, the prima facie case requirement falls away and the sole remaining issue is whether age was a determining factor in the termination. *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1054 (7th Cir.1990); *see also Gehring,* 43 F.3d at 343–44 (discussing "determining factor"). The standard of review requires us to view the evidence in the light most favorable to Mr. Shank and to determine whether the evidence and all reasonable inferences that may be drawn therefrom support the jury's determination. *See Futrell,* 38 F.3d at 346.

Mr. Shank insists that Kelly–Springfield's proffered reason for termination—that Mr. Shank submitted a false refund claim—was phony. To support his contention that the reason was untruthful, Mr. Shank points to the following: (1) Thrasher signed the refund form, indicating that he approved the rebate to Mr. Shank, and did not testify at trial; (2) Mr. Shank was replaced by a younger employee, Lautzenheiser; (3) two months passed between Mr. Shank's submission of the false form and his termination, and no mention was made of the false filing in that two-month period; (4) within a year of Mr. Shank's termination, there were no district managers over the age of 50; (5) although James reported Mr. Shank's misconduct to Kelly–Springfield's corporate counsel, he did not report it to Goodyear's corporate counsel as required by company policy; and (6) Kelly–Springfield allegedly treated Kevin Harper, a younger district manager, more favorably. According to Mr. Shank, his unauthorized discount to the dealer was not really a serious offense, although it was contrary to the technical terms of the Business Conduct Policies. Kelly–Springfield trumped up the importance of the violation in November to justify its desire to replace him with a young trainee. Mr. Shank says that the jury made the inference that Kelly–Springfield had lied about firing Mr. Shank because of fraud and that, based on the evidence, the inference was reasonable.

] We must determine whether the jury's inference was a reasonable one. There are, as Kelly–Springfield points out, substantial holes in Mr. Shank's theory. It is true that Thrasher signed the refund form in the box that indicates he approved the transaction. But, on his copy, he wrote that he signed it only because James had directed him to do so. James explained that he wanted Thrasher to sign it to document that Thrasher had received the refund request. James had Thrasher send him the original so that he (James) could retain the document as a record of the basis for dismissal. It was extraordinarily unusual for James to receive an employee's refund request form; they were supposed to be forwarded by Thrasher to the company's accounts payable department. Indeed, this was the first time that James had ever requested that a refund request form be sent to him. This testimony was uncontroverted. Although the jury could have drawn an adverse inference from Kelly–Springfield's failure to call Thrasher as a witness at trial [3] (especially since Kelly–Springfield's lawyer had informed the jury that she would be calling Thrasher during the defense case), a summary of Thrasher's deposition explaining his actions was read to the jury by Mr. Shank's counsel, thereby minimizing the jury's ability to draw too adverse an inference, see *United States v. Warwick,* 695 F.2d 1063, 1069 (7th Cir.1982). Further, James' uncontradicted explanation for the delay between Mr. Shank's misconduct and his termination was that James and Thrasher had crossed wires. James had approved the termination over the phone with Thrasher in August. His schedule was busy for the next several weeks and included some time out of the country. When he returned and spoke with Thrasher in late October, James was surprised that Thrasher had not yet terminated Mr. Shank. Thrasher, on the other hand, apparently had believed that James was going to take action. Immediately after this conversation, Mr. Shank was indeed terminated by Thrasher pursuant to James' instructions. It is an unreasonable stretch to say that the two-month delay was so long that it would permit a reasonable inference of pretext under the circumstances. See *Sample v. Aldi, Inc.,* 61 F.3d 544, 549 (7th Cir.1995) (noting that a delay in discharging an employee does not allow for an inference that there was discrimination). Nor is the bare fact that Mr. Shank was replaced by the younger Lautzenheiser significantly probative. When Mr. Shank was terminated, James called Nelms, who heads the company's training program in Maryland, and asked for the next available trainee as a replacement. Nelms sent Lautzenheiser; James did not request any specific individual. Moreover, Thrasher had to cover Mr. Shank's territory for 60 days because Lautzenheiser was not yet ready to assume the duties of a district manager; this fact further minimizes Mr. Shank's argument that Kelly–Springfield had timed his termination to coincide with the end of Lautzenheiser's training. Nelms, a stranger to Mr. Shank's discharge, could have sent anybody to fill Mr. Shank's spot, and he can send trainees like Lautzenheiser anywhere in the United States where they are needed. Similarly, the fact that the older district managers had retired or become inactive (which Kelly–Springfield informs us means medical leave) within a year of Mr. Shank's termination, a fact not raised until Mr. Shank's rebuttal closing argument, is substantially undercut by the reasons those employees left. The ambiguous documents submitted to the jury (with little explanation of their contents) show that the five employees to which Mr. Shank refers had not been terminated, but had retired or were inactive. Likewise, James' failure to report Mr. Shank's misconduct to Goodyear's counsel hardly goes to show that he is lying about why he fired Mr. Shank. The jury was no doubt impressed by this fact because Mr. Shank's counsel, during James' cross-examination, got James to admit that his failure to report to Goodyear's counsel violated the same set of policies that Mr. Shank was fired for violating. But this evidence does little to show anything about the veracity of James' proffered basis for termination. Finally, no reasonable inference of pretext could have

**3.** See *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *Oxman v. WLS–TV,* 12 F.3d 652, 661 (7th Cir.1993); *Littlefield v. McGuffey,* 954 F.2d 1337, 1346–47 (7th Cir.1992).

been drawn from the evidence concerning Thrasher's treatment of Harper. Harper did not engage in fraudulent conduct and was not terminated. His situation was not comparable to Mr. Shank's, and in any event, one example of better treatment is not enough to support an inference of discrimination, *Kuhn v. Ball State Univ.*, 78 F.3d 330 (7th Cir. 1996).

We are considering whether judgment as a matter of law was appropriate. It therefore is impermissible to weigh the evidence in considering such a motion, though most of the above-mentioned evidence went uncontested. Nevertheless, we must conclude that it was unreasonable as a matter of law for the jury to infer, on the basis of the evidence as a whole, that Kelly–Springfield's proffered reason for Mr. Shank's termination was pretextual. The totality of the evidence does not permit a reasonable inference that Kelly–Springfield was lying about the real reason it fired Mr. Shank and discriminated against him on the basis of age. Indeed, the district court's remarks from the bench in response to Kelly–Springfield's motion for judgment as a matter of law evidence a conviction that, based on its assessment of the evidence, including its appraisal of James' testimony, the weight of the evidence would not support a verdict for Mr. Shank:

> Now there's nothing at all in this record whatsoever, zero, zip, nada, to suggest that age was any motivating factor, influencing factor, reason or had anything whatsoever to do with this termination except the plaintiff's subjective comments.

> [T]he plaintiff ha[s] demonstrated a prima facie case.... After plaintiff demonstrates a prima facie case defendant has the burden to articulate a legitimate rea-

son. The defendant has done that. Defendant through the testimony of Mr. James almost to the point of being more cumulative than even this Court would imagine did indicate that, I told Thrasher to terminate him. Two months later I wondered why he wasn't terminated. I told him to terminate him.

> He also advised that the termination was because of the forgery, but more than that the improper refund through the family discount sought by the plaintiff. He set forth this is the reason for the termination. He indicated that this form was set forth in Exhibit 205, that he has that original, that based upon the conduct of the plaintiff that the plaintiff should be terminated. He determined, as has the plaintiff in his testimony, that the refund policy should not have been pursued by the plaintiff.

Tr. at 2–165 to 2–166. The court also found unassailable the evidence supporting the legitimacy of Kelly–Springfield's proffered reason for discharge: "The testimony is without dispute that the termination was because of the plaintiff's actions in pursuing this refund policy and the way in which it was pursued by this plaintiff." Tr. at 2–166. The court went further:

> And this is the nub. Where, except for the prima facie case which the Court has determined, is there any evidence whatsoever, even a scintilla of evidence, that this was—the real reason was a pretext for age discrimination? This Court can find absolutely none.

Tr. at 2–166 to 2–167.[4]

We do not believe that the evidence of record provides a reasonable basis for con-

---

4. These statements were made after Mr. Shank had rested his case and Kelly–Springfield had begun to present the testimony of James. After making these statements, the court realized that it might have been considering the testimony of James as presented during Kelly–Springfield's defense, in addition to James' testimony as presented during Mr. Shank's case. The court stated it would have been improper to consider Kelly–Springfield's evidence at that time under Rule 50. Although the case was "flimsy," noted the court, it reserved ruling until after a recess to consider whether the evidence presented by the plaintiff, absent James' testimony during the de-

fendant's case, was sufficient to keep the case alive. After the recess, the court denied Kelly–Springfield's motion, stating that "[t]he Court is of th[e] opinion that there is no evidence of discrimination on the basis of age. The Court believes that the jury would have some difficulty in making the leap from the evidence which is before it to determine that the plaintiff was terminated because of age." Tr. 2–178 to 2–179. Yet the court decided that a reasonable jury might make such an inference and reserved ruling on the motion. In response, the defense rested its case, probably believing that the district court, now able to consider James' testimo-

cluding that Mr. Shank was terminated because of his age. The jury's verdict cannot stand.

## Conclusion

For these reasons, the judgment of the district court is reversed.

REVERSED.

ny as presented during the defense's case, would grant the motion for the reasons the court articulated before the defense had rested. Instead, the court decided in a short one-sentence statement to reserve ruling and to submit the case to the jury.