In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-2722 & 01-2793

JEFFREY O'NEAL MARSHALL,
a minor by his guardian ad litem Paul J.
Gossens,

Plaintiff-Appellee,

v.

DANIEL TESKE, ALFONZO MORALES,
and DAVID KOLATSKI,

Defendants-Appellants.

Appeals from the United States District Court
for the Eastern District of Wisconsin
No. 98-C-0306--Thomas J. Curran, Judge.

Argued January 7, 2002--Decided March 27, 2002


   Before MANION, ROVNER, and EVANS, Circuit
Judges.

   EVANS, Circuit Judge.  In this civil
rights action under 42 U.S.C. sec. 1983,
three Milwaukee police officers appeal a
jury verdict finding that they violated
the constitutional rights of a 14-year-
old boy by arresting and holding him in
custody for 10 hours, all without
probable cause. Ironically, the case
against the three officers got a major
boost from two other Milwaukee police
officers who happened, fortunately for
the boy and his lawsuit, to be in the
right place at the right time.

   The jury heard conflicting facts and we
will recount both sides, although in an
appeal like this we accept as true the
winner's version of the events.

   Jeffrey Marshall is African-American. He
was 14 years old on September 11, 1997.
September 11, back in 1997, was an
uneventful day--it was warm, and kids
were playing around Milwaukee's 92nd and
Birch Streets, a neighborhood full of
small, four-unit apartment houses.
Shortly after 6 p.m. Marshall left his
house, about four blocks away, and went
to the 92nd and Birch area to find his

younger brother, who was supposed to be there. At that very moment, about a dozen Milwaukee police officers were covertly converging on the area intent on executing a search warrant at one of the four-family apartments on Birch Street. Three undercover officers--Daniel Teske, Alfonzo Morales, and David Kolatski--were part of the search warrant team, and their role was to act as "containment" during the search--they were to make sure that no persons fled from the apartment. The officers claim that this area was known for illegal drug-dealing activity. Marshall testified that he had never heard that the neighborhood was known for drug activity and that he often played there with other kids. Marshall added that he didn't use drugs, had never seen drug dealing, and had never seen a police raid (or arrest) in the neighborhood.

The officers said they had information that the drug dealer whose apartment was to be searched often used lookouts and that they had seen a young black male standing as a lookout on the drug dealer's front porch on a previous occasion. They also testified that they had seen young black males in front of the building earlier that same day. This, of course, should not have been all that unusual since the area was a densely populated neighborhood loaded with young African-Americans.

When Officers Teske, Morales, and Kolatski arrived to execute the search warrant, they parked behind the apartment building. They then split up and moved from the rear to the front of the building around its west and east sides. The three officers wore police-issue maroon windbreakers. Each windbreaker had the words "POLICE NARCOTICS" printed on its back and a velcro flap that could be used to cover the lettering. The front of the jacket contained the word "POLICE" and a Milwaukee police badge emblem, and another velcro flap for hiding the word and emblem. The officers claim that the velcro flaps on the front and back of their jackets were down, revealing their police insignias, when they moved into position.

Marshall claims that he did not see anything identifying the men as police. They were just wearing maroon jackets, and at least two of the officers were

wearing masks which covered their faces. One of the officers, Morales, wore a ski mask because he did not want to jeopardize his undercover identity. At the time of this incident, the Milwaukee police department had a policy permitting containment team officers to wear masks during the execution of search warrants. It has since changed that policy. Even without masks, the officers didn't look much like your stereotypical police. Kolatski, an undercover vice squad officer, was wearing blue jeans and tennis shoes. He had long hair and a goatee. All of the officers were carrying guns.

The parties disagree about where Marshall was when the officers arrived on the scene. Kolatski claims that he saw Marshall sitting on the front porch of the apartment building. Marshall testified that he was standing on the public sidewalk talking to his friend Nate, whom he bumped into while looking for his younger brother. The distance between the front porch and the public sidewalk is only a few feet.

As soon as Marshall saw the officers-- running with guns and with masks covering their faces--he fled. Marshall said he ran for fear of being robbed or shot. Kolatski claims that he verbally identified himself as a police officer and ordered Marshall to stop. He and Morales chased Marshall, and Teske joined the chase, running on a parallel route down an alley. Teske says that he yelled words to the effect of "Stop! Police!" and that he heard Kolatski do the same. Marshall claims that he never heard the officers verbally identify themselves as police.

Coincidentally, Milwaukee police officers Steven Hoyt and Richard Jacobs, who did not know a search warrant event was taking place, were a short distance away. Hoyt and Richards were in full police uniform and sitting in a marked squad car. Marshall ran straight to them for protection. He told Hoyt and Jacobs that robbers were chasing him.

Hoyt and Jacobs then saw Teske running down the alley. They did not realize that Teske was a police officer, so they aimed their guns at him. Hoyt and Jacobs repeatedly yelled at Teske to drop his

gun. They testified that Teske's actions caused them to fear great bodily harm to themselves and others, and therefore that they were prepared to shoot him. Jacobs testified that when he first saw Teske, the velcro flap on his windbreaker was up, concealing his police insignia. He also testified that when Teske got close to the squad car, Teske pulled down the flap to reveal his identity.

Once Teske was within earshot, Hoyt and Jacobs were able to hear him verbally identify himself as a police officer. Teske also yelled to them to "get the guy in blue," referring to Marshall.

After realizing that Teske was a police officer, Hoyt and Jacobs handcuffed Marshall, who did not resist in any way. Marshall was searched from head to toe and the route he ran was traced, and no evidence linking him to drugs or any other crime was discovered. Marshall testified that Teske even pulled down his (Marshall's) pants and underwear, exposing his genitals. The officers never told Marshall why he had been arrested and did not respond when he asked what he had done wrong. Marshall testified that he told the officers that he fled because he thought that they were robbers.

Marshall was placed in a squad car and driven back to the apartment building where the search was taking place. He remained in the squad car for about 30 minutes to an hour. Meanwhile, Marshall's brother brought their parents to the scene. Marshall's mother told the officers that Marshall had been home sick all day and had only just left the house to find his brother. Marshall's mother and stepfather also asked the officers to release Marshall into their custody because he was a minor. Morales told them that Marshall had been arrested for obstructing an officer and could not be released because the officers were still investigating. When Marshall's parents persisted in their request that Marshall be released, Teske shouted at Marshall's stepfather, "Don't you understand, don't you fucking understand!"

Marshall was taken downtown to the police station and booked. After being locked in a cell for about 4 hours, at around midnight, Marshall received a municipal citation for obstructing an

officer. Marshall then remained locked in his cell for another 5 hours. At no time was he allowed to contact his parents or an attorney. Finally, at around 5 a.m., officers drove Marshall home in a squad car. The municipal citation was later dismissed for failure to prove the elements of the charged offense.

Marshall sued the officers under 42 U.S.C. sec.1983 for false arrest and excessive force. The jury returned a verdict in favor of the police officers on the excessive force claim, but for Marshall on the false arrest claim. They awarded Marshall $25,000 in compensatory and $100,000 in punitive damages./1 The officers moved for judgment notwithstanding the verdict or, in the alternative, dismissal or reduction of the damages award. The district court denied their motion and entered a judgment for Marshall which included $86,375 in attorneys fees for his counsel, Paul J. Gossens.

In reviewing the district court's decision whether to enter judgment as a matter of law, we review the record as a whole to determine whether there was sufficient evidence from which a reasonable jury could have returned the verdict. See Shank v. Kelly-Springfield Tire Co., 128 F.3d 474, 478 (7th Cir. 1997). We view the evidence in the light most favorable to the party winning the verdict. See id.

The first issue we address is whether the officers lacked probable cause to arrest Marshall. An officer has probable cause to arrest when the totality of the facts and circumstances within his knowledge and of which he has reasonably trustworthy information is sufficient that a prudent person would believe that the suspect committed or was committing an offense. See United States v. Sawyer, 224 F.3d 675, 678-79 (7th Cir. 2000). We evaluate probable cause not from the perspective of an omniscient observer, but on the facts as they would have appeared to a reasonable person in the position of the arresting officer. Mahoney v. Kesery, 976 F.2d 1054, 1057 (7th Cir. 1992).

The officers argue that they had probable cause to arrest Marshall because he fit the description of the drug

dealer's lookout. This argument is weakened by the fact that the search warrant did not contain a physical description of the lookout. It is also weakened by the conflicting testimony about where Marshall was standing when the officers arrived on the scene. The officers claim that he was sitting on the front porch, but Marshall claims that he was standing on the public sidewalk talking to his friend Nate.

The officers attempt to bolster their probable cause argument by drawing parallels to Illinois v. Wardlow, 528 U.S. 119 (2000). There, the Supreme Court found that reasonable suspicion existed to stop and frisk a suspect where the suspect fled upon seeing police officers patrolling in an area known for heavy narcotics trafficking. See id. at 121-24. While patting down the suspect, officers discovered a gun. They then arrested the suspect, who was later convicted of possession of a firearm by a felon. See id. at 122. In upholding the stop and frisk, the Supreme Court held that the combination of the suspect's presence in a high-crime area and his "unprovoked flight upon noticing the police" was sufficient to give the officers reasonable suspicion that he was engaged in criminal activity. See id. at 124.

The officers' reliance on Wardlow is misplaced. Although the suspect in Wardlow was eventually arrested, tried, and convicted, the Supreme Court focused on whether the police officers initially had reasonable suspicion to stop and frisk him. Reasonable suspicion is a less demanding standard than probable cause, requiring only that the officer have a reasonable, articulable suspicion that criminal activity may be afoot. See id. at 123 (citing Terry v. Ohio, 392 U.S. 1 (1968)). Upon reasonable suspicion, police may conduct only a brief investigatory stop. See id. In Wardlow, probable cause to arrest arose only after the officers discovered that the suspect was carrying a gun. Here, if a search of Marshall had turned up a gun or drugs, he would not only not have a viable sec. 1983 civil claim, he would have had a date to appear in juvenile court on a delinquency charge.

So the officers may not rely on Wardlow to show that they had probable cause to

arrest Marshall for being a drug lookout. Even had reasonable suspicion existed to stop and frisk Marshall, the search of his person and the surrounding area turned up no evidence linking him to the drug activity under investigation nor to any other crime. But it's doubtful that the officers had even reasonable suspicion to stop Marshall, given that his flight was not "unprovoked." Marshall did what any sane person would do if he saw masked men with guns running toward him: he ran like hell. And he ran right to uniformed police officers for protection! He wasn't trying to get away from the "police"-- he was trying to get to the "police" as fast as he could.

But probable cause need not have existed for the charge for which the suspect was initially arrested so long as it existed for a closely related charge. See Biddle v. Martin, 992 F.2d 673, 676 (7th Cir. 1993). The officers contend that they had probable cause to arrest Marshall for resisting them and obstructing their investigation. Wisconsin law makes it a misdemeanor to knowingly resist or obstruct an officer while he is performing any act in his official capacity and with lawful authority. See Wis. Stat. Ann. sec. 946.41. The City of Milwaukee has a parallel ordinance. See Milwaukee Code of Ordinances sec. 105-138. The Fourth Amendment allows police officers to make warrantless arrests for minor criminal offenses even if they are punishable only by a fine. See Atwater v. City of Lago Vista, 121 S. Ct. 1536, 1541 (2001).

Here, the argument that the defendant police officers had probable cause to arrest Marshall for knowingly resisting or obstructing them is absurd. Because we are required to construe the facts in the light most favorable to Marshall, we assume that the officers did not identify themselves sufficiently to notify Marshall that they were police. This assumption is supported by the testimony of Hoyt and Jacobs, who did not initially realize that Teske was a police officer. Only after Teske pulled down the velcro flap covering his police insignia did Hoyt and Jacobs realize that Teske was an officer. Construing the facts in the light most favorable to Marshall, we assume that the flap was covering Teske's police insignia at the time that Marshall

first saw Teske and that Teske knew that this was the case. Based on Marshall's testimony that he did not see nor hear anything identifying the officers as police, we assume that all of the containment officers were insufficiently identifiable as police. Therefore, because the defendant officers were not identifiable as police, a reasonable officer in their position would not have assumed that Marshall was knowingly running away from them and thus resisting or obstructing their actions as "police officers." A reasonable officer would have realized that someone who runs toward a marked police car is not knowingly resisting or obstructing police.

The officers also argue that they were entitled to qualified immunity. At the time that Marshall's civil rights suit went to trial, the law in our circuit was that a jury's determination that an officer's conduct was objectively unreasonable under the Fourth Amendment determined for qualified immunity purposes whether a reasonable officer could have believed that his conduct was lawful. See McNair v. Coffey, 234 F.3d 352, 355 (7th Cir. 2000). The Supreme Court, however, vacated our holding in McNair and remanded for further consideration in light of its holding in Saucier v. Katz, 121 S. Ct. 2151 (2001). See Coffey v. McNair, 121 S. Ct. 2545, 2545 (2001)./2

Saucier held that even in cases in which the question of qualified immunity is factually intertwined with the question of whether officers violated the Fourth Amendment (in that case, by using excessive force), judges must still make an immunity determination separate from the jury's finding on whether the officers violated the plaintiff's constitutional rights. See Saucier, 121 S. Ct. at 2154. Saucier established a two-part qualified immunity inquiry. First, the court must ask whether, taken in the light most favorable to the plaintiff, the facts alleged show that the officers' conduct violated a constitutional right. See id. If the facts alleged make out a constitutional violation, the court must then ask whether the right was clearly established.

As we have discussed, viewing the facts in the light most favorable to Marshall, the officers violated his right not to be arrested without probable cause. The next step is determining whether Marshall's right not to be arrested under these circumstances was clearly established. The probable cause standard--requiring that an officer's knowledge of the facts be sufficient to warrant a prudent person in believing that the suspect had committed or was committing a crime--was clearly established at the time of this incident. See United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995); Simkunas v. Tardi, 930 F.2d 1287, 1291 (7th Cir. 1991).

Here, the facts and circumstances within the officers' knowledge were not sufficient to warrant a prudent officer to believe that Marshall had committed or was committing a crime. With regard to the drug lookout theory, the officers found no evidence on Marshall's person that identified him as a drug lookout. Nor did Teske find any weapons, drugs, or other evidence of a crime when he retraced Marshall's steps back to the point at which the chase began. Therefore, probable cause did not exist to arrest Marshall for being a drug lookout. Likewise, the officers lacked probable cause to arrest Marshall for knowingly resisting or obstructing their activities. The plain language of both the state statute and the city ordinance covering resistance and obstruction prohibit only knowing resistance or obstruction. Because the officers did not sufficiently identify themselves, a prudent person in their position would not have cause to believe that Marshall was knowingly resisting or obstructing.

Finally, the officers argue that there was no reasonable basis for the punitive damages award. A jury may award punitive damages in a sec.1983 case if it finds that the defendants' conduct was motivated by evil intent or callous indifference to the plaintiff's federally protected rights. See Coulter v. Vitale, 882 F.2d 1286, 1289 (7th Cir. 1989).

Without recounting all the evidence, we think it was sufficient to support the jury's award of punitive damages. Marshall was a young boy who fled from armed (and masked) men not readily

identifiable as police officers. Seeking protection, he ran toward a marked police car containing uniformed officers. When he was arrested, Teske pulled down Marshall's pants and underwear, exposing his genitals. The officers detained Marshall even after a search of his person and the surrounding area produced no evidence linking him to a crime. What's more, the officers never bothered to explain to Marshall why he had beenarrested, and they ignored his explanation that he had run out of fear of being robbed or shot. Instead, they took him downtown, booked him, and locked him up without allowing him to call his parents or an attorney. The officers took several hours to issue Marshall a flawed municipal citation, which was later dismissed. After receiving the citation, Marshall remained locked up for another 5 hours until 5 a.m. Under these circumstances, the jury had sufficient evidence to find that the officers demonstrated a callous disregard for Marshall's rights, especially considering his age and the fact that his parents were at the scene of the arrest pleading for his return to their custody.

The judgment of the district court is AFFIRMED.

FOOTNOTES

/1 Twenty-five thousand dollars as to Teske; $60,000 as to Kolatski; and $15,000 as to Morales.

/2 We announced in McNair v. Coffey, ___ F.3d ___, 2002 WL 111362 (7th Cir. Jan. 2002), that Saucier necessitated a change in our analysis of qualified immunity claims. We applied Saucier's two-part immunity inquiry, holding that although the defendant police officer's actions violated the plaintiffs' constitutional rights, the officer was nevertheless entitled to qualified immunity because a reasonable officer in his position would not have understood that his actions violated the plaintiffs' rights. See McNair, 2002 WL 111362 at *1, *4.


 MANION, Circuit Judge, concurring.  Given the appearance and demeanor of the three defendants as they attempted a surprise execution of a search warrant on a suspected drug house, Marshall had good reason to flee. He may not have heard or at least not believed those chasing him were police. However, when determining whether or

not a prudent officer in their position would have believed that probable cause existed to support an arrest, we look to the officers' knowledge at the time of the arrest, not the suspect's. See United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995). The three officers could have reasonably believed that Marshall's flight meant he was a "lookout" and wanted to separate himself from the crime scene. They could not have known that he did not hear their shouts of "Stop! Police!" nor failed to recognize them as police officers during the pursuit. Therefore, when they caught up with Marshall, a brief detention and search would not have been out of line. By the time everyone caught their breath it should have been obvious Marshall was not acting as a lookout. The uniformed officers were concerned that Teske was possibly a robber with a gun and Marshall ran to them for protection from the apparent robbers. That determination should have ended the episode because, regardless of the identification issue, the undercover officers should have realized that a person who runs to the aid of uniformed police officers could not be knowingly obstructing a police officer. Instead the officers pressed on with a long detention and a bogus charge of obstruction. As I see it, what occurred after the opportunity to get an explanation from the uniformed officers is where the facts justify the jury's finding of liability, damages and even punitive damages, excessive as they might have been.