Johnny TILSON, Plaintiff,

v.

CITY OF ELKHART, INDIANA, Mark DeJong and Peggy Posthuma, in their official and individual capacity, Defendants.

No. 3:01cv732.

United States District Court, N.D. Indiana, South Bend Division.

May 1, 2003.

Douglas M. Grimes, Gary, IN, for Plaintiff.

E. Nelson Chipman Jr., Elkhart, IN, Lynn E. Kalamaros, Hunt, Suedhoff, Kalamaros LLP, South Bend, IN, for Defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This matter is before the Court on Defendants', the City of Elkhart, Indiana ("Elkhart"), and Mark DeJong ("DeJong"), motion for summary judgment. This case involves claims brought under the Fourth and Fourteenth Amendments of the United States Constitution, the Indiana Constitution and state law by Plaintiff, Johnny Tilson ("Tilson"), against the Defendants, Elkhart and DeJong. The claims against Defendant, Peggy Posthuma, are not addressed, as the parties have filed a Stipulation of Dismissal with regard to all claims against her. The claims brought by Tilson arise out of an incident which occurred on October 15, 1999. The Defendants claim that the undisputed evidence shows that no Fourth or Fourteenth Amendment claim exists against DeJong in his official capacity or against Elkhart. They further contend that no claim exists against DeJong in his individual capacity, and in any event, that he is entitled to qualified immunity. Finally, the Defendants contend the claims under state law also fail as a matter of law.

## I. Background

On October 15, 1999, before this incident occurred, Tilson testified that he got off work at 2:00 pm, went home and showered and then got out in the street and started partying. (Deposition of Tilson, p. 14–15). He went to various friends' houses, although he could not remember exactly whose houses he went to or even how many houses he visited. He recalled drinking some gin, some Crown Royal, maybe one can of beer, and a number of shots of brown liquor and some wine, but did not recall the amount that he drank. (Deposition of Tilson, p. 17). He also had some wine in the car with him. (Deposition of Tilson, p. 17).

Tilson was driving his own car at all times. Tilson recalled seeing the police officer when he was on Redding Street. Tilson turned left on Main Street. The next time Tilson recalled seeing the police officer was when he was at home, being bitten by the police dog. (Deposition of Tilson, p. 24). Tilson cannot recall if the police officer said anything to him that evening. (Deposition of Tilson, p. 29). He also cannot recall anything that happened between the time that the dog was biting

him and when he woke up at Elkhart General Hospital. (Deposition of Tilson, p. 31).

On October 15, 1999, DeJong was on routine patrol northbound on Redding in a police car. He first observed Tilson trying to park in a very small parking spot. DeJong testified that Tilson looked back at DeJong and then took off, drove up and over the curb on the opposite side of the street, and then back onto the street. DeJong observed this behavior which he considered to be a traffic infraction. (Deposition of DeJong, p. 21, 29), and at that time thought Tilson was a possible drunk driver and was trying to elude him by quickly deciding to pull away. (Deposition of DeJong, p. 29–30, 91). After DeJong turned his lights on, Tilson continued driving, going left on Main Street and then stopped in the middle of the intersection. (Deposition of DeJong, p. 32–33). Tilson then jumped out of his car and DeJong ordered him back into his car. Tilson got back into his car and then DeJong ordered him to turn off his engine and throw his keys into the street. Tilson then drove off northbound on Willard. (Deposition of DeJong, p. 33–36). DeJong had followed him, got out of his police car, yelling, "Stop K–9, Stop K–9" and released his dog, ordering the dog to make the apprehension. (Deposition of DeJong, p. 36). Tilson was running, not wobbling or stumbling such that DeJong did not consider him a highly intoxicated or feeble person. (Deposition of DeJong, p. 91–93).

DeJong's K–9 immediately stopped Tilson, biting and holding him, as the K–9 was trained. When DeJong arrived at the location where the K–9 had stopped Tilson, he pushed Tilson to the ground to gain better control of him, called off the bite, and another officer handcuffed Tilson. (Deposition of DeJong, p. 50–51). DeJong did not know the severity of the injury the K–9 had inflicted, but had Tilson removed

by an ambulance and only later learned that his femoral artery had been punctured. (Deposition of DeJong, p. 46–47, 60–61). The injuries in this case were the most severe that DeJong's dog had ever inflicted. (Deposition of DeJong, p. 61).

Following the arrest, DeJong filed charges against Tilson for Felony Fleeing and Felony Driving While Intoxicated. (Deposition of DeJong, p. 19, 36–37, Exhibit 1). Prior to or since October 15, 1999, Tilson had not had any problems with the Elkhart Police Department. (Deposition of Tilson, p. 36). Current Assistant Chief Bill Faus was supervisor of the K–9 Unit from 1976–1992. Whether the Elkhart Police Department K–9 Guidelines allow the use of a K–9 to bite and stop a running suspect depends upon the circumstances in each individual case. (Deposition of Faus, p. 76–77).

Based upon the use of the K–9, in his Complaint, Tilson claims that the Defendants violated his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure and excessive force in seizing him. He alleges that Elkhart trains its K–9's to inflict cruel and unusual punishment on suspects by biting and holding a suspect regardless of the circumstances and discriminates in its policy practices by stopping citizens based on ethnicity and race, both in violation of the Fourteenth Amendment. Tilson also makes state law claims based upon the Fourth and Fourteenth Amendment of the Indiana Constitution and assault and battery torts.

## II.  Standard Of Review

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bragg v. Navistar Int'l Trans. Corp.*, 164 F.3d 373 (7th Cir.1998). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting FED.R.CIV.P. 56); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497 (7th Cir.1998). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Weicherding v. Riegel*, 160 F.3d 1139 (7th Cir. 1998); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir.1994); nor may that party rely upon conclusory allegations in affidavits. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir. 1995).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir.1996). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson*, 477 U.S. at 252–55, 106 S.Ct. 2505. Applying the above standard, this Court will now address Defendants' motion.

## III. Discussion

### A. Tilson's Federal Law Claims

Tilson claims that the seizure and arrest in question violated his Fourth and Fourteenth Amendment rights and that Elkhart failed to train its officers and had a discriminatory policy of making police stops.

#### 1. Claims Against Elkhart And De-Jong In His Official Capacity

■ A municipality cannot be held liable under Section 1983 on a respondeat superior theory. *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Since *Monell*, Courts have held that in order for a plaintiff to recover against a municipality under Section 1983, the plaintiff must demonstrate that the municipality was the moving force behind the injury alleged by showing that the municipality had a policy or custom that caused the plaintiff's injury. *See, Board of Commissioners v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In order to maintain a Section 1983 claim against Elkhart and DeJong in his official capacity, Tilson must demonstrate that an official policy or custom was the cause of his constitutional injury. *See, Monell*, 436 U.S. at 693, 98 S.Ct. 2018.

The Defendants argue that Tilson's allegation of a failure to train did not meet the burden of establishing municipal liability. In cases such as this, alleging excessive force, a failure to train will not support a claim against Elkhart, when there is not evidence that the use of excessive force is

common. *See Dye v. Wargo,* 253 F.3d 296, 299 (7th Cir.2001). The Constitution does not require municipalities to conduct training programs. Poor training is instead a means of showing intent for those constitutional torts where intent matters, and excessive force under the Fourth Amendment is not one of those constitutional torts. *Id.* Tilson has not offered any evidence that use of excessive force is common in Elkhart. The City would have to possess actual or constructive notice that such a failure to train would likely result in constitutional deprivations. *See Robles v. City of Fort Wayne,* 113 F.3d 732, 735 (7th Cir.1997). Such notice could be established through learning of a pattern of constitutional violations, or where a clear constitutional duty is implicated in recurrent situations that a particular officer is likely to face. *Id.* Plaintiff has failed to allege that any of these defendants were on notice of a pattern of constitutional violations or a recurrent situation that would create an obvious need for certain training.

In regards to the equal protection claim of racial discrimination in police stops alleged by Tilson, there is no evidence that race played any part in the stop in question. An equal protection claim requires proof that the defendants' actions had a discriminatory effect and were motivated by discriminatory purposes. *Chavez v. Illinois State Police,* 251 F.3d 612, 635–36 (7th Cir.2001). Furthermore, there is no evidence that Tilson was treated differently than members of an unprotected class, which is a required element of his Fourteenth Amendment claim. *Id.* at 636.

There is no evidence of an express municipal policy that violated Tilson's rights, under the Fourth and Fourteenth Amendments. Nor is there evidence of an action by an official with policy-making authority nor of the existence of an unconstitutional custom or practice which can be attributed

to Elkhart. Thus, the claims against Elkhart and DeJong in his official capacity must fail as a matter of law.

## 2. Claims Against DeJong In His Individual Capacity

The Defendants argue that DeJong possessed probable cause to stop Tilson based upon his actions in the operation of his vehicle and in fleeing from the police. And that based upon these actions, the force used to stop him was reasonable, such that no excessive force claim exists. They further contend that there is no evidence that DeJong stopped Tilson for anything other than that reason.

### a. Probable Cause

■ Officer DeJong testified that he observed Tilson trying to parallel park his car in a very small spot, and then after noticing Officer DeJong behind him, proceeded to drive up onto the curb on the opposite side of the road, and then back onto the street, quickly pulling away. In light of this conduct, DeJong suspected that Tilson may have been intoxicated. A decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). This requires only a reasonable belief, not one that is correct, and only contemplates examination of the evidence known by the officer at the time of seizure or arrest. *Qian v. Kautz,* 168 F.3d 949, 953 (7th Cir.1999). The Defendants argue that based upon DeJong's observations, he had probable cause to believe Tilson committed a traffic violation and therefore the decision to stop him was reasonable. Furthermore, the Defendants argue that despite DeJong attempting to stop Tilson, he continued driving. By continuing to drive, Tilson committed the felony of resisting

arrest under I.C. 35–44–3–3(b)(1)(A). The Defendants claim that DeJong had further probable cause to arrest Tilson because he was fleeing from a police officer.

The court must consider the facts as they would have reasonably appeared to the arresting officer "seeing what he saw, hearing what he heard" at the time of the incident. *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir.1988). DeJong's observations, coupled with the fact that Tilson continued to drive after DeJong had made an attempt to stop him, justified the stop. There is probable cause to arrest if the totality of the facts and circumstances known to a reasonable arresting officer would support the belief that the suspect has committed or is committing a crime. *Marshall v. Teske*, 284 F.3d 765, 770 (7th Cir.2002). DeJong reasonably believed, in light of Tilson's conduct, that he may have been intoxicated. In attempting to stop Tilson based on this belief, Tilson continued driving, thus furthering DeJong's belief of misconduct by Tilson. Moreover, there is no Fourth Amendment violation so long as the officers had probable cause "to arrest the suspect either for the precise offense the officers cited or for a closely related charge." *Williams v. Jaglowski*, 269 F.3d 778, 783 (7th Cir.2001).

### b. Excessive Force

■ The next issue to determine is whether, based upon these actions, the force used to stop Tilson was reasonable, such that no excessive force claim exists. In general, the use of excessive force to effect an arrest is evaluated under the Fourth Amendment reasonableness standard, assessing the objective facts which confronted an officer at the time and taking into account, 1) the severity of the crime at issue, 2) the immediate threat to the safety of the officers or others posed by the suspect, and 3) the resistance by the suspect, including active resistance or attempting to resist arrest by flight. *Gra-*

*ham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The force used in this case involved the use of a police K–9.

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. at 394, 109 S.Ct. 1865. "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Id.* at 395, 109 S.Ct. 1865. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 *quoting United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

"The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the question is "whether the totality of the circumstances" justifies the officers' actions. *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the perfect vision of hindsight. *Id.* The question in Fourth Amendment excessive use

of force cases is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. at 397, 109 S.Ct. 1865.

While the Seventh Circuit has not addressed an excessive force claim in this specific context, other courts have determined that use of a K–9 under similar circumstances does not constitute excessive force. For instance, in *Matthews v. Jones,* 35 F.3d 1046 (6th Cir.1994), the police stopped a speeding driver, who was also suspected of driving while intoxicated, but after the driver stopped his car, he fled into a wooded area. *Id.* at 1048. The suspect did not stop and the police, after a warning, released the police dog who stopped the suspect by biting him. The *Matthews* Court concluded that the use of the dog to stop the fleeing driver was not in violation of the Fourth Amendment, given the Plaintiff's behavior and the possible threat to others. *Id.* at 1051.

Similarly to *Matthews,* Tilson refused to stop, fled from his car, and began running toward a house. DeJong made the decision to release the K–9 in order to apprehend Tilson, given the felony committed as well as the possible threat to residents. Given the resistance of Tilson, the force used was reasonable. Therefore, no Fourth Amendment violation occurred based upon the amount of force used.

### c. Qualified Immunity

■ Even if a constitutional violation had occurred, the Defendants argue that DeJong's conduct did not violate clearly established standards under existing case law and therefore he would be entitled to qualified immunity. *See Jarrett v. Town of Yarmouth,* 309 F.3d 54, 56–7 (1st Cir. 2002); *See also, Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Qualified immunity is an affirma-

tive defense for government officials in Section 1983 suits which allege constitutional violations. The doctrine shields officials from civil damages liability so long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To determine whether a government official is protected by qualified immunity, courts make two inquiries: (1) whether the plaintiff suffered a constitutional injury, *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), and (2) whether "an objectively reasonable official would have believed that his conduct was lawful 'in light of clearly established law and the information that the official possessed at the time of his allegedly unlawful conduct,'" *Kelley v. La-Force,* 288 F.3d 1, 7 (1st Cir.2002).

This Court does not believe that a constitutional violation occurred, however, even if such were the case, DeJong's conduct did not violate clearly established standards under existing case law and therefore he would be entitled to qualified immunity.

### B. Tilson's State Law Claims

The remaining causes of action in the complaint fall under the Indiana Constitution and state tort law. The state claims share a common nucleus of fact with the federal claims, and therefore, the Court may retain jurisdiction where a decision on the claims will serve the interests of judicial economy, convenience, and fairness to the parties. *See, United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### 1. Indiana Constitution

■ Tilson cites to the Fourth and Fourteenth Amendment as the provisions

violated by the Defendants, however the only provision dealing with seizures under the Indiana Constitution is Article 1 Section 11. Its purpose is to protect citizens from unreasonable intrusions into those parts of life regarded as private. *Justice v. State,* 765 N.E.2d 161, 167 (Ind.Ct.App. 2002). "Searches and seizures are evaluated under an independent reasonableness standard considering the totality of the circumstances." *Id.* As has already been discussed in this case, any seizure was reasonable in light of the totality of the circumstances known to Officer DeJong at the time. DeJong possessed probable cause and exercised a reasonable amount of force in effecting the stop given the circumstances of Tilson's conduct as well as his fleeing. Therefore, Defendants are entitled to summary judgment as a matter of law in regards to the claims brought under the Indiana Constitution.

### 2. Assault And Battery Claims

■ A police officer, in the lawful discharge of his duties, is privileged to use that force which is reasonably necessary to effect an arrest. *City of South Bend v. Fleming,* 397 N.E.2d 1075, 1077 (Ind.App. 1979). Only if the officer uses unnecessary force is his conduct no longer privileged, subjecting him to a charge of battery. *Id.* It has been established that based on the evidence, no excessive force was used by DeJong against Tilson. Therefore, the force used to effect the arrest attaches to DeJong, entitling him, as well as Elkhart, to judgment as a matter of law on the assault and battery claims brought by Tilson.

### IV. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment is hereby **GRANTED.** The Clerk shall enter final judgment in favor of the Defen-

dants and against the Plaintiff on all of the Plaintiff's claims.

**IT IS SO ORDERED.**