Darrick A. LAWRENCE, Plaintiff,

v.

KENOSHA COUNTY and Louis Vena, Defendants.

No. 02–C–1216.

United States District Court, E.D. Wisconsin.

Feb. 2, 2004.

---

**6.** Defendant Skelton does not specifically object to Schonauer's deposition.

Robert E. Sutton, Milwaukee, WI, for Plaintiff.

Marianne Morris Belke and Raymond J. Pollen, Crivello Carlson & Mentkowski, Milwaukee, WI, for Defendants.

## DECISION AND ORDER

RANDA, Chief Judge.

This action arises out of a summer country western concert event, known as "Country Thunder." Defendant Kenosha County Sheriff's Department law enforcement officer Louis Vena ("Vena") was directing traffic at the concert and plaintiff Darrick Lawrence ("Lawrence") was departing the area in his vehicle. Lawrence, an Illinois resident, alleges that Vena, "acting without probable cause, banged on [Lawrence's] truck with his hand" and then "negligently jerked [Lawrence's] left arm behind his back and forcibly removed [Lawrence] from his vehicle thereby damaging [Lawrence's] left rotator cuff." (Amended Complaint ¶¶ 6–8). Lawrence

claims that Vena's actions constitute excessive use of force in violation of the Fourth and Fourteenth Amendments (First Cause of Action) and negligence under state tort law (Second Cause of Action).[1]

This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. § 1331 and the state claim pursuant to 28 U.S.C. § 1367, the supplemental jurisdiction statute. Venue is proper under 28 U.S.C. § 1391.

Defendants Kenosha County and Vena (collectively "defendants") seek summary judgment dismissing this action. The motion will be addressed herein. Also pending is the defendants' motion to strike (Docket # 36), and the defendants' motion to strike plaintiff's medical expense claims (Docket # 45).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial—(1) the absence of

a genuine issue of material fact and (2) an entitlement to judgment as a matter of law—is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson,* 477 U.S. at 267, 106 S.Ct. 2505; *see also, Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R.Civ.P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548 (emphasis added).

## RELEVANT FACTS[2]

On July 18, 2002, Lawrence attended the Country Thunder event, in the Village of Twin Lakes, Kenosha County, Wisconsin.

---

1. Although Lawrence has named Kenosha County as a defendant, he has not plead any cause of action against them.

2. As a general matter, unless accompanied by citation, the relevant facts are taken from the defendants' proposed findings of fact which are not disputed. Citations to sources of

At approximately 11:00 p.m., Vena, acting pursuant to his duties as a deputy sheriff, was performing the routine duty of controlling traffic spills from that event.

Kenosha County Sheriff's Department Deputy William Peck ("W.Peck"), assigned to traffic control at the intersection of County Highway P and 110th Street for the Country Thunder event, was in the intersection directing traffic with Kenosha County Sheriff's Department Deputy Chris Peck ("C.Peck") (no relation to W. Peck). Vena, who at all relevant times was employed by the Kenosha County Sheriff's Department as a Captain,[3] had responded to assist them.

A severe traffic jam was caused by approximately 4,000 vehicles that were attempting to exit the event. After discussion among the officers, it was determined that traffic would be routed in two eastbound rows from the main gate. In this manner, the vehicles desiring to travel north from the exit could turn one way and vehicles desiring to travel south could turn the other way. Due to the high volume of traffic leaving the grounds, westbound traffic on 100th Street was closed, allowing two lanes eastbound on 100th Street.

Vena drove his unmarked squad car with all emergency lighting in operation toward the exit of the event to help control traffic. He was wearing a red Kenosha County Sheriff's Department baseball-type hat with "Kenosha County Sheriff's Department" embroidered in yellow around a silver star patch on the front. Attached to Vena's belt was a full sized gold badge in the area of his exposed firearm as well as handcuffs, a magazine carrier, pager, cell phone and a key holder with keys.

As Vena watched traffic from his squad car, he observed a problem arise three or four cars back where the cars were attempting to change lanes prior to reaching the deputies assigned to direct traffic. Vena exited his squad car in an attempt to correct the problems before any collisions occurred. Vena moved two vehicles safely from the north lane to the south lane when he observed a green sports utility vehicle ("SUV") turn into the path of a compact vehicle driven by a female driver.[4]

By the time Vena reached the situation, the green SUV was almost parallel with the compact car and was turning into its path. (DPFOF ¶ 16). Vena did not believe that the driver of the SUV, later identified as Lawrence, realized that the compact car was there. He therefore put his hands up to stop the SUV from moving forward.[5]

---

quoted excerpts have been included even when those excerpts are undisputed.

 Pursuant to Civil L.R. 56.2(e), the Court has concluded that there is no genuine material issue as to proposed findings of fact to which there was no response. Any factual statements which are disputed and do not have support in the record were disregarded for purposes of this decision. To the extent Lawrence's objections to the proposed findings of fact failed to cite specific evidentiary support, the objection was given no weight. The Court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment. *L.S. Heath Son, Inc. v. AT & T*, 9 F.3d 561, 567 (7th Cir.1993).

3. Subsequently, Vena retired from the Kenosha County Sheriff's Department.

4. This sentence is based on paragraph 16 of the defendants' proposed findings of fact (DPFOF) which is undisputed and states that the two vehicles were moved "to the south lanes to the north lanes." As a result of a typographic error, the sentence makes no sense. The evidentiary source cited for the proposed finding, the Affidavit of Louis Vena filed September 15, 2003 (Vena.Aff.), states that two vehicles were moved "from the south lane to the north lane...." (Vena Aff. ¶ 15). The Court has corrected the typographical error.

5. It is undisputed that Vena asked Lawrence which direction he was going and that Law-

Because Vena was standing in front of the SUV and the headlights were illuminated, he could not tell if Lawrence was watching for his signal. As the SUV began moving forward, Vena stepped out of its path.

There is a dispute regarding what happened next, but eventually Vena asked Lawrence to produce his driver's license.[6] Lawrence did not produce his driver's license and his SUV was still in motion. At that point, there were both pedestrians and stopped traffic on all sides of Lawrence's vehicle presenting a clear danger to all around him. Vena ordered Lawrence to stop the SUV, but the SUV was still attempting to proceed, failing to obey Vena's orders to stop. Lawrence contin-

ued to fail to obey orders and Vena reached into the vehicle attempting to put it into park.

Vena opened the driver's door and attempted to place the SUV in park or to shut off the ignition, but he was unable to reach over to stop the SUV. When W. Peck appeared to assist Vena, Lawrence stopped and exited the SUV. Upon exiting the SUV, Lawrence was not handcuffed nor was he directed to the ground.

Because there were thousands of cars lined up waiting to exit the event, Vena asked Lawrence's passenger, Jessica Uccardi ("Uccardi"), if she would be able to drive the vehicle off to the side of the road. Vena also asked Lawrence whether Uccar-

---

rence replied he was going south, but there is a factual dispute between the parties as to whether this exchange occurred before or after Vena had physical contact with the hood of the SUV. There is also a dispute regarding the nature of Vena's physical contact with the hood of the SUV.

It is undisputed that Lawrence verbally objected to Vena's physical contact with the hood of the SUV and the objection closed with "you ass." However, there is a dispute regarding the exact phrasing of the objection and exactly when the objection was made. Relying upon his affidavit and Uccardi's affidavit, Lawrence attempts to raise a dispute as to whether his vehicle was moving during the time in question. However, the defendants assert these are "sham affidavits." (Defendants' Reply to Plaintiff's Opposition to Defendants' Proposed Findings of Fact at 1).

The defendants are referring to "sham issues of fact," created by using affidavits to contradict prior sworn deposition testimony. *See Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1169–70 (7th Cir.1996)*. It is well established that parties cannot thwart the purposes of Rule 56 by creating "sham" issues of fact with affidavits that contradict their prior depositions. *See Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1169–70 (7th Cir.1996) (citing Diliberti v. United States, 817 F.2d 1259, 1263 [7th Cir.1987]; Babrocky v. Jewel Food Co., Retail Meatcutters Union, 773*

F.2d 857, 861 [7th Cir.1985]; *Miller v. A.H. Robins Co., 766 F.2d 1102, 1104 [7th Cir. 1985]*). "Inherently, depositions carry an increased level of reliability." *Darnell v. Target Stores, 16 F.3d 174, 176 (7th Cir.1994)*. Depositions are adversarial in nature and provide the opportunity for direct and cross-examination. *Id.*

The defendants are correct that Lawrence's deposition testimony, at page 34, and pages 37 through 38, that the SUV was moving, is contradicted by paragraphs 6 through 7 and 20 of his subsequent affidavit stating that it was not moving. Likewise, the deposition testimony of Uccardi, at pages 24 through 26, was that the SUV was moving and is contradicted by her subsequent affidavit at paragraphs 6 through 7 which state that it was not moving. Lawrence may not rely upon either of these affidavits to create an issue of fact regarding whether the vehicle was moving at the time in question.

6. There is a dispute between the parties regarding how Vena indicated that Lawrence should produce his driver's license. According to Vena, he asked Lawrence for his driver's license. (Vena Aff. ¶ 23). According to Uccardi, Vena "demanded," Give me you driver's license." (Affidavit of Jessica Uccardi [Uccardi Aff.] ¶ 5). There is also a dispute about what happened after Vena indicated that Lawrence should produce his driver's license.

di had permission to drive his vehicle to which he replied in the affirmative.

Vena asked Uccardi if she had been drinking to which she replied "not a drop." (Affidavit of Louis Vena [Vena Aff.] ¶ 44). Vena directed Uccardi to a safe location on the north shoulder of the road, while Vena and W. Peck continued their evaluation of Lawrence. When questioned, Lawrence indicated that he had not been drinking alcohol and requested a breathalyzer test. In responding to an inquiry about his reaction to Vena, Lawrence finished by stating, "I don't let anybody touch my fucking truck." (Vena Aff. ¶ 39). Lawrence was then questioned about his language and informed that if he continued to curse he would be arrested for disorderly conduct. W. Peck stated it is "illegal to swear here and our response was correct." (Affidavit of Darrick Lawrence [Lawrence Aff] ¶ 11).

Vena then took Lawrence's driver's license to the squad car where he checked for warrants pursuant to standard operating procedure. Vena's handcuffs and ammunition were visible. Vena advised Lawrence that he would receive via the mail a citation for failure to obey an officer's signal.

Lawrence indicated that he wished to make a complaint regarding damage to his SUV. In response, Vena gave Lawrence a business card with Vena's name, phone number and address. Vena asked W. Peck to handle the report, since Vena was the one being accused of the alleged damage.

As a result of Lawrence's actions on that evening, Vena requested that a citation for failure to obey officer's signal be issued to Lawrence.

### W. Peck

According to W. Peck, he observed a green Tahoe-type SUV attempting to change lanes approximately five-car lengths west of his location. As the SUV was cutting across the center of the roadway, W. Peck observed the driver's door open with Vena alongside the open door.[7] The SUV was still in motion while Vena was in the doorway in a confrontation with Lawrence. To W. Peck, it appeared that the driver was trying to elude Vena. W. Peck ran up to assist Vena as the SUV had stopped in the middle of the roadway due to a high volume of traffic. When W. Peck approached, he could hear Vena ordering the driver to stop the SUV and get out of the vehicle.

The driver of the SUV was identified as Lawrence. He was still very angry and W. Peck had to tell him several times to relax and calm down. Lawrence continued to argue with Vena stating, "I didn't know you were a cop." (Peck Aff. ¶ 22). Vena had in plain view on his waistband his service weapon, badge and handcuffs. When Lawrence had calmed down and continued his discussion with Vena, W. Peck returned to his traffic duties.

A short time later, Vena requested that W. Peck speak with Lawrence regarding a complaint that Lawrence had regarding damage to his vehicle during the incident. Lawrence pointed out to W. Peck two scratches, approximately three inches in length on his driver's side door/window

---

7. This paragraph is based on paragraphs 61 and 62 of the defendants' proposed finding of fact. However, these proposed findings do not indicate whether W. Peck or C. Peck made these observations. Reference to the affidavit of W. Peck, cited as "Affd. of Peck" in the defendants' proposed findings of facts, reveals that the observations were made by him. Likewise, the affidavit of W. Peck discloses that the two following paragraphs in the relevant facts involve him although the defendants' proposed findings of fact paragraphs 76–77, 79–83 upon which they are based do not specify whether W. Peck and C. Peck was involved.

frame. Lawrence advised W. Peck that the damage had occurred during the incident and wanted to file a complaint.

### Heyden

Lieutenant Richard Heyden ("Heyden") of the Kenosha County Sheriff's Department, who was responsible for obtaining information from Lawrence and Uccardi to be forwarded to Chief Deputy Charles R. Smith ("Smith") for further investigation, met with Lawrence and Uccardi on July 21, 2002, regarding Lawrence's complaint.

According to Lawrence, he, his girlfriend Uccardi and her six-year-old daughter had left the parking area at the Country Thunder event and it took ten to fifteen minutes to turn right out of the parking area and onto a county road. Lawrence described the exodus of attendees as everybody just "piling out." Both lanes of the county road were traveling in the same direction (eastbound) and Lawrence was in the left lane. Lawrence stated that traffic was moving very slowly and that he listens to music when he is in traffic to "keep from getting aggravated." (Affidavit of Lieutenant Richard A. Heyden [Heyden Aff.] ¶ 8).

Lawrence stated that he realized that he needed to get into the right lane so he turned on his turn signal. At some point, Lawrence was between lanes and stopped for approximately three to four minutes. At first, Lawrence stated Vena came up to the front of his vehicle. After further interview, Lawrence stated that he did not see Vena come up to the front of his vehicle because he was looking at a couple to his right who were having a fight. Lawrence described Vena as wearing a grey sweatshirt and jeans. According to Lawrence, Vena was waving a flashlight across the front of the hood and asked Lawrence which way he wanted to go. Heyden asked Lawrence whether the pounding on his vehicle hood that he claimed Vena had done, damaged his hood. Lawrence responded that it did not.

Heyden then asked Lawrence to describe how Vena pounded on his hood. According to Heyden, Lawrence stammered and then said, "he pounded on it." (Heyden Aff. ¶ 18). Using a knocking on a door example, Heyden asked Lawrence to compare the knock on the hood. Lawrence began knocking as if he was knocking on a door but he stopped and raised his hand higher to about eight inches, then knocked on the table. Lawrence then stated to Heyden that Vena had no right to touch his vehicle.

According to Heyden, Lawrence seemed fixated and animated on this point stating that this was his truck. According to Lawrence, he responded to the knock on his hood by saying "you don't have to pound on my hood you ass." *Id.* at ¶ 24. At this point, Lawrence stated that Vena came around to his side of the vehicle and started to argue with him. Lawrence told Heyden that at some point during the arguing, Vena asked for his driver's license and that Lawrence then said, "who are you to ask for my driver's license?" *Id.* at ¶ 27. Lawrence reported that Vena then told him that he was under arrest. Lawrence stated that at that point he tried to drive his SUV away.

According to Lawrence, Vena then reached into the SUV and tried to put the vehicle in park and get him out of the SUV, but Lawrence still had his seat belt on so that he could not be removed from the SUV. Lawrence stated that it was at this point that W. Peck arrived to help. Lawrence then complied with Vena's request.

Lawrence related that Vena then asked Lawrence's passenger Uccardi, if she was okay to drive. Allegedly, Uccardi stated, "yes, we're fine." *Id.* at ¶ 35. Uccardi then moved the vehicle to the shoulder of

the road, and Lawrence and Vena argued at the back of the SUV about Lawrence being intoxicated. Lawrence said that he asked for Vena's name and was told that he would be receiving a citation by mail. Vena then went to his squad after getting Lawrence's driver's license and recorded the information.

Lawrence stated there was damage to paint on his door. When Lawrence got his license back, he asked to file a criminal damage charge for damage done to his vehicle by Vena. Lawrence alleges that a uniformed deputy on the scene then told him to go home and "sleep it off." *Id.* at ¶ 41.

After completing the interview with Lawrence, Heyden interviewed Uccardi, Lawrence's girlfriend and a passenger in Lawrence's SUV the night of the incident. She described Vena's garb as a red hat with a police emblem, grey shirt, khaki cargo pants, and his gun and badge on his right side. Uccardi further clarified that Vena's badge was just to the right of his pant's snap. Lawrence maintains that he did not see Vena's badge until he was out of the truck.

While describing how the incident occurred, Uccardi indicated that Vena knocked on the hood of the vehicle, and stated she knew that this would make Lawrence mad because he gets "anal" about his truck (Heyden Aff. ¶ 47). Further, Uccardi stated that she knocked on the hood of the SUV earlier in the day and Lawrence yelled at her for doing it, and that previously she had damaged the SUV by scraping its side which also made Lawrence mad.

Uccardi also stated that she had observed Vena, who was a couple of cars ahead of them, directing traffic with his flashlight but she did not see how Vena ended up in front of the SUV. She stated that when Vena knocked on the SUV hood, she knew that this made Lawrence mad

and she acknowledged that Lawrence called Vena an "ass." *Id.* ¶ 53. When Lawrence was taken out of the SUV, Vena asked Uccardi if she was "okay" to move the vehicle. *Id.* at ¶ 55. Uccardi stated that she responded that they were sober. Uccardi further stated that it was not unusual for her to have to "step in" with Lawrence regularly. *Id.* at ¶ 58. In describing the argument between Lawrence and Vena, Uccardi stated it was as if two stubborn people were arguing, with no reference to arguing with a law enforcement officer on the side of the road.

*Smith*

Smith was and currently is employed as Chief Deputy in the Kenosha County Sheriff's Department. As a result of citizen's complaint 2002–95090 made by Lawrence, an internal investigation was conducted under Smith's supervision. The Kenosha County Sheriff's Department findings regarding Lawrence's complaint against Vena were conveyed to Lawrence by a letter dated August 6, 2002, and signed by Smith. The letter is part of the record before the Court and is appended to Smith's affidavit which was filed on September 15, 2003.

**ANALYSIS**

The defendants assert that the complained of actions do not rise to the level of a constitutional deprivation, maintaining that according to Lawrence's version of the incident, he was not seized pursuant to the Fourth Amendment when the force was applied. Additionally, they contend that, although Lawrence alleges that Vena acted without probable cause, he states no cause of action for false arrest, and that since Lawrence was never placed under arrest an evaluation of probable cause, although present, is not necessary. The defendants assert that, even if Lawrence's version of the events are taken as true, his

claim does not amount to a cognizable claim for use of excessive force. They further assert that qualified immunity bars Lawrence's individual capacity claim against Vena. Additionally, the defendants maintain that Lawrence's inability to show an unconstitutional policy or practice requires dismissal of his § 1983 claim against Kenosha County. Further, the defendants maintain that the discretionary actions of Vena in performing the investigatory stop of Lawrence cannot give rise to liability for negligence since such actions are protected by governmental immunity conferred by Wis. Stat. § 893.30(4).

In arguing that he was subject to a Fourth Amendment seizure, Lawrence maintains that he was forcibly removed from his vehicle by Vena after he was told he was under arrest, and was required to give Vena his driver's license. Lawrence states the facts show that he was forcefully ejected from his vehicle because he called Vena an "ass" for pounding on the hood of his SUV. Additionally, Vena's suspicion that Lawrence may have been drinking or under the influence of drugs is unreasonable because it is based solely upon Lawrence's reaction to Vena pounding on the hood. Further, he was subjected to a "full-blown arrest" without probable cause. Lawrence also contends that Vena used excessive force on Lawrence that caused him physical injury where there was no objectively reasonable basis for Vena's use of excessive force. Lawrence also maintains that where a municipal entity ratifies the acts of its agent as did the Kenosha County Sheriff's Department in its official response to Lawrence's citizen complaint, the agent's acts become those of the municipal entity. Lawrence does not respond to the governmental immunity argument which the defendants raised with respect to Lawrence's state negligence claim.

Lawrence does not specify whether he is suing Vena in his individual or his official capacity.

### Qualified Immunity

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court revisited the issue of qualified immunity in a Fourth Amendment excessive force claim and clarified the nature of the two-step qualified immunity inquiry. The threshold question is whether "[t]aken in the light most favorable to the party asserting the injury," the "facts alleged" show the officer's conduct violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151. In the event that no violation of a constitutional right is established, further analysis of the qualified immunity issue is unnecessary. *Id.*

However, if a violation is demonstrated, the analysis proceeds to the second step which requires that the court determine whether the right was clearly established. *Id.* Such inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 [1999] ).

"[I]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." 533 U.S. at 202, 121 S.Ct. 2151. (*citing Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 [1986] [qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"] ). However, if various courts agree that "certain conduct" is a constitutional violation under facts which are not distin-

guishable from the facts presented in the case before the court, the officer would not be entitled to qualified immunity based simply on the argument that courts have not agreed on "one verbal formulation of the controlling standard." *Id.* at 202–03, 121 S.Ct. 2151.

In explaining why the inquiries for qualified immunity and excessive force are distinct even after *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) which sets forth the objective reasonableness standard for evaluating excessive force claims, the Supreme Court stated that qualified immunity has a further "dimension." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151. The Supreme Court emphasized that "the concern of the qualified immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* The Supreme Court noted that *Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. *Id.* Thus, the Supreme Court further stated that "[q]ualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes 'hazy border between excessive and acceptable force,' *Priester v. Riviera Beach*, 208 F.3d 919, 926–927 (11th Cir. 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206, 121 S.Ct. 2151.

*Excessive Force and False Arrest Claims*

■ Lawrence presents his excessive force and false arrest claims under the Fourth and Fourteenth Amendment. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395, 109 S.Ct. 1865 (*emphasis in original*); *see Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).[8] Likewise, claims that arrests are made without probable cause do not raise a Fourteenth Amendment substantive due process claim; rather the constitutional right, if any, violated would be the Fourth Amendment freedom from unreasonable seizure. *See Albright v. Oliver*, 510 U.S. 266, 274–75, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

■ Under 42 U.S.C. § 1983, a plaintiff is required to establish that the defendant, acting under color of state law, deprived him of a constitutional right, in this instance, his Fourth and Fourteenth Amendment freedom from unreasonable seizure by the State. *See Soldal v. Cook County*, 506 U.S. 56, 60 n. 6, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (*citation omitted*). Courts are mindful, however, that "every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation. Some such conduct may simply violate state tort law or indeed may be perfectly legal, though unseemly and reprehensible." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir.1994) (*citation omitted*).

■ Probable cause to arrest exists "if the totality of the circumstances known to a reasonable arresting officer would support the belief that the suspect has committed or is committing a crime." *Driebel v. Milwaukee*, 298 F.3d 622, 643 (7th Cir.2002). The Court must consider the facts as they would have reasonably appeared to the arresting officer "seeing what he saw, hearing what he heard" at

---

**8.** The Fourth Amendment provides that the "right of the people to be secure in their persons ... against unreasonable ... seizures [of the person] shall not be violated." U.S. Const. amend. IV.

the time of the incident. *Id.* (*quoting Richardson v. Bonds,* 860 F.2d 1427, 1431 [7th Cir.1988]). Reasonable suspicion is a less demanding standard than probable cause requiring only that the officer have a reasonable, articulable suspicion that criminal activity may be afoot. *Marshall ex rel. Gossens v. Teske,* 284 F.3d 765, 770 (7th Cir.2002) (*citing Illinois v. William,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 [2000] [*citing Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]).

■ A person has been seized within the meaning of the Fourth Amendment only if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The Supreme Court applies a two-part test to decide whether a person has been seized so that Fourth Amendment protections are triggered; first, it must be determined if physical force was used along with a show of authority, and second, whether or not the person submitted to the show of authority. *California v. Hodari D.,* 499 U.S. 621, 624–26, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). There must be "an intentional acquisition of physical control," *Brower v. Inyo County,* 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), with the state actor "restrain[ing] the freedom of a person to walk away, [thereby] seiz[ing] that person." *Tennessee,* 471 U.S. at 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (*citation omitted*).

In *Brower,* the Supreme Court considered the parameters of a seizure in the context of a high speed chase that ended when the fleeing suspect fatally crashed into what was alleged to be a "deadman roadblock" set by county police officers.[9] The Court concluded that a roadblock of the kind alleged constitutes a seizure because it "is not just a significant show of authority designed to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur." *Brower,* 489 U.S. at 598, 109 S.Ct. 1378. More generally, the *Brower* Court opined that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 596–97, 109 S.Ct. 1378 (*emphasis in original*).

The Supreme Court also distinguished between two hypothetical situations. In the first case, no seizure occurs if a fleeing suspect unexpectedly loses control of his vehicle and crashes; a mere show of authority (flashing lights and continued pursuit) without an intentional acquisition of physical control is insufficient to give rise to a seizure. *Id.* at 595–96, 109 S.Ct. 1378. By contrast, if a police cruiser "had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." *Id.* at 597, 109 S.Ct. 1378.

■ "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment

9. Brower's complaint alleged that the respondent police officers placed an 18–wheel truck completely across the highway in the path of the fleeing vehicle, behind a curve, and with a police cruiser's headlights aimed in such a fashion as to blind the driver as he approached. The circumstances of this case, regardless of how they are viewed, do not rise to the level of those discussed in *Brower.* However, *Brower* is nonetheless instructive.

requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (*quoting Garner,* 471 U.S. at 8, 105 S.Ct. 1694 [*further internal quotations omitted* ] ). The "reasonableness standard" cannot be precisely defined or mechanically applied. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. On the contrary, it turns on the totality of the circumstances of each particular case including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The determination must also consider "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

 The "reasonableness" standard is objective. *Id.* at 397, 109 S.Ct. 1865. Whether a use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and must turn on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396, 397, 109 S.Ct. 1865; *see Saucier,* 533 U.S. at 206, 121 S.Ct. 2151.

As recently stated in *Bell v. Irwin,* 321 F.3d 637, 640 (7th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 84, 157 L.Ed.2d 36 (2003) with respect to a § 1983 excessive force claim dismissed upon summary judgment:

> When material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety. But when material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do except second-guess the officers, which *Graham* held must be prevented. Since *Graham* we have regularly treated the reasonableness of force as a legal issue, rather than an analog of civil negligence. *See, e.g., Smith v. Ball State University,* 295 F.3d 763, 770–71 (7th Cir.2002); *Smith v. Chicago,* 242 F.3d 737, 743–44 (7th Cir. 2001); *Hebron v. Touhy,* 18 F.3d 421 (7th Cir.1994); *Titran v. Ackman,* 893 F.2d 145 (7th Cir.1990).

 Viewed in the light most favorable to Lawrence, the facts indicate that on the night of July 18, 2002, as the crowd was exiting the concert grounds, Vena, wearing a cap emblazoned with the Kenosha County Sheriff's Department logo, and—at his belt—a full sized gold Deputy Sheriff's badge, a firearm, magazine carrier, and handcuffs, came up to Lawrence's SUV and waved a flashlight across the front of its hood. Vena asked Lawrence which way he wanted to go and pounded on the hood from a height of more than eight inches. Lawrence, unaware that Vena was a law enforcement officer, responded "you don't have to pound on my hood you ass." Vena believed that Lawrence was becoming irrational and that he might have been on drugs or alcohol.[10] Vena asked Law-

---

10. There is a dispute between the parties regarding Lawrence's behavior. Lawrence avers that his behavior was not irrational, although he was angry. (Lawrence Aff. ¶ 21). Uccardi avers that Lawrence never raised his voice until Vena was trying to pull Lawrence through the window. (Uccardi Aff. ¶ 6). Vena avers that after he stepped out of the SUV's path, the driver stopped after only a

rence for his driver's license. Lawrence questioned Vena's authority to request his license. Vena told Lawrence "fine, then you're going to jail," and put his arm through Lawrence's window and began pulling on him. (Lawrence Aff. ¶ 7). Lawrence then tried to drive away.

While Lawrence's vehicle was in motion, Vena opened the driver's door and attempted to place the SUV in park and to remove Lawrence from the SUV. Vena could not get the vehicle in park and Lawrence had his seat belt on so he could not be removed from the vehicle.

Lawrence stopped resisting when W. Peck arrived.[11] In W. Peck's presence, Lawrence continued arguing with Vena. Lawrence did not realize that Vena was a law enforcement officer until he saw W. Peck. Lawrence was neither handcuffed nor directed to the ground once he was outside the vehicle.

There was no damage to the hood of Lawrence's vehicle. Lawrence showed W. Peck two scratches about three inches long on his driver's side door/window frame. Lawrence alleges his left rotator cuff was injured by Vena.

In view of all the circumstances presented, when Vena reached into the window of Lawrence's SUV and grabbed Lawrence, Vena affected a seizure of Lawrence. At that time, a reasonable person in Lawrence's position would believe that he was

"not free to leave." *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870.

At the time of this seizure, there was probable cause to arrest Lawrence based on his failure to respond to Vena's directive to produce his driver's license. A reasonable officer in Vena's position could have believed that Lawrence had violated Wisconsin law making it a misdemeanor to knowingly resist or obstruct an officer when he is performing any act in his official capacity and with lawful authority.[12] *See Marshall,* 284 F.3d at 771 (*citing* Wis. Stat. § 946.41).[13] The Fourth Amendment allows police officers to make warrantless arrests for minor criminal offenses even if they are only punishable by a fine. *Id.* (*citing Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 [2001] ).

Lawrence's position that he did not realize that Vena was a law enforcement officer, is accepted as true for purposes of summary judgment. However, Vena was wearing a cap with a prominent Sheriff's Department symbol, and a full size badge, gun, and ammunition at his belt.[14] Thus, the facts of this case are distinguishable from those of *Marshall,* where a minor arrestee fled from armed, masked undercover police officers and the officers failed to identify themselves sufficiently to notify the boy that they were police. Under the circumstances of this case, a reasonable police officer aware of all the facts and

---

few feet and began screaming out of his window, saying "You didn't have to hit my car." (Vena Aff. ¶ 21). According to Vena, Lawrence continued to become totally irrational and began cursing and called him an "ass." *Id.* at ¶ 22. *See also, Id.* at ¶¶ 23 & 24.

**11.** There is a dispute between the parties regarding whether W. Peck had any physical contact with Lawrence. *Compare* Uccardi Aff. ¶ 9 and W. Peck Aff. ¶ 15.

**12.** This statute has been adopted by the Kenosha County as Kenosha County Ordinance

§ 9.946.41(Aug. 7, 2001), *available at http://www.co.kenosha.wi.us/corpc/ordinances.phtml http* (last visited Jan. 22, 2004).

**13.** *See also, Braun v. Baldwin,* 346 F.3d 761, 764–65 (7th Cir.2003).

**14.** Additionally, the situation where the encounter occurred and the maturity of the plaintiff are different from those presented in *Marshall.*

circumstances would believe that Lawrence was knowingly violating the officer's lawful directive to produce his license. Thus, there was probable cause to believe that Lawrence had committed an offense.

The next question is whether Vena applied excessive force. As previously noted this is an objective question which turns on the totality of the circumstances. While Lawrence's failure to comply with the order to produce his license may be viewed as relatively minor, following this refusal the SUV was in motion which in turn presented a danger to the pedestrians and stopped traffic that surrounded it. In addition, because Lawrence had the vehicle in motion a reasonable officer would perceive that Lawrence was attempting to evade arrest. *See McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir.2002) ("[P]eople ordered to stop, on probable cause to arrest, must halt immediately; they cannot make their own decisions about when and where they will surrender").

Under the circumstances and accepting as true Lawrence's position that Vena reached into the SUV and grabbed and pulled him, Vena's actions—although not ideal—were reasonable.[15] *See Smith v. Ball State Univ.*, 295 F.3d 763, 770–771 (7th Cir.2002); *See also, Bell*, 321 F.3d at 641 ("To say that police officers have acted within the bounds the Constitution sets is not necessarily to say that they have acted wisely"). There are insufficient facts to show that the force which was applied by Vena to Lawrence was constitutionally excessive. Therefore, Lawrence's excessive force and false arrest claims will be dismissed on summary judgment because the acts do not rise to the level of a constitutional violation.

Given this Court's conclusion, further analysis of the qualified immunity issue is unnecessary. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *Driebel*, 298 F.3d at 637. The plaintiff bears the burden of demonstrating that a constitutional right is clearly established. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir.2000). "The law is 'clearly established if various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" *Driebel*, 298 F.3d at 651(citations omitted).

While Lawrence has cited cases setting forth the standards for evaluating his false arrest and excessive force claims, he has not met his burden of demonstrating, in the parlance of the analysis of qualified immunity, that the law was clearly established. Thus, even if constitutional violations had been established on these claims, in the specific context of this case, it would not be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

*Kenosha County*

Lawrence fails to provide any basis to hold Kenosha County liable. A municipality cannot be held liable under 42 U.S.C. § 1983 solely on the grounds of *respondeat superior*. *Monell v. New York Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, the government as an entity is responsible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.*

---

**15.** The defendants assert that Vena was justified in grabbing Lawrence because he believed that Lawrence was intoxicated, screaming, cursing and acting irrational. This is a matter of factual dispute. Therefore, the Court does not premise its conclusion on this scenario.

at 694, 98 S.Ct. 2018. There must be a direct causal link between the alleged unconstitutional deprivation and the municipal policy or custom at issue. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In *Bd. of County Comm'rs. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Court explained that a § 1983 plaintiff cannot merely identify conduct properly attributable to the municipality, but must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

As summarized by the court of appeals for this circuit, there are three ways in which a municipality can be found to have violated an individual's constitutional rights: 1) an express policy that, when in force, causes a constitutional deprivation, 2) a wide spread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with a force of law, or 3) an allegation that the constitutional injury was caused by a person with final policy making authority. *See Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994).

 "The fact that a particular official—even a policy making official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–482, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (*citation omitted* ). Rather, before the municipality can be held liable, the policy-making official must also be responsible for establish-

ing final government policy respecting such activity. *Id.* at 482–83, 106 S.Ct. 1292. Lawrence has neither alleged, nor presented any evidence which might provide a basis for holding Kenosha County liable under § 1983.

*State Law Negligence Claim*

Lawrence's complaint also asserts a state law negligence claim. The defendants assert that this claim is barred by the governmental immunity afforded by Wis. Stat. § 893.30(4). This contention is not addressed by Lawrence.

Jurisdiction over any state law claims alleged by the plaintiff is based on the supplemental jurisdiction statute, 28 U.S.C. § 1367. The statute provides that a district court "may decline to exercise supplemental jurisdiction" over the pendant state law claims if the court has dismissed all claims over which it has original jurisdiction. *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir.1994).

 When federal claims in a suit have been dismissed, balancing the factors to be considered under the pendent jurisdiction doctrine, "judicial economy, convenience, fairness, and comity," will generally indicate that jurisdiction over state law claims be dismissed. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Wright*, 29 F.3d at 1251.

 Here, however, Lawrence has not responded to the defendants' argument that his state negligence claim is barred as a matter of law. Furthermore, the defendants are correct in their argument. *See Willow Creek Ranch, L.L.C v. Shelby*, 235 Wis.2d 409, 611 N.W.2d 693 (2000). Therefore, this Court retains jurisdiction over Lawrence's supplemental claim and dismisses it as barred by the governmental

immunity afforded by Wis. Stat. § 893.80(4).

### Motions to Strike

These motions seek to strike Lawrence's designated expert medical witness (Docket # 36) and Lawrence's medical expense claims (Docket # 45). Because of the Court's dismissal of this action, these motions are moot.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**

The defendants' motion for summary judgment (Docket # 18) is **GRANTED** and this action is **DISMISSED,**

The defendants' motion in limine (Docket # 36) is **DENIED,** as moot,

The defendants' motion to strike plaintiff's medical expense claims (Docket # 45) is **DENIED,** as moot, and

The Clerk of Court is directed to enter final judgment accordingly.

**SO ORDERED.**